# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 10cr82-BTM |
|---|---|
| Plaintiff, | **ORDER RE INVOLUNTARY MEDICATION ORDER** |
| v. | |
| BARAC BARAJAS-BANDT, | |
| Defendant. | |

On January 19, 2011, the Court held an evidentiary hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003), to determine whether the government would be permitted to forcibly medicate Defendant for the purpose of rendering him competent to stand trial. For the reasons that follow, the Court **DENIES** the government's request for entry of an order to involuntarily medicate Defendant.

## I. BACKGROUND

Defendant is charged with violating 18 U.S.C. § 115(a)(1)(B) for threatening to kill a United States Judge and 18 U.S.C. § 876(c) for mailing a threatening communication to a United States Judge. On May 12, 2010, the Court held a competency hearing and found Defendant incompetent to stand trial. [Dock. #34.] The Court then temporarily committed Defendant to a Bureau of Prisons medical facility to determine whether he could be restored to mental competency such that proceedings could go forward. [Dock. #43]

On August 11, 2010, Dr. Patrick Gariety of the United States Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield") issued a report concluding that

Defendant did not meet the criteria for involuntary medication under *Washington v. Harper*, 494 U.S. 210 (1990), because he was not a danger to himself or others in the institutional context. (Def. Exh. [hereinafter "Exh."] A)

On September 8, 2010, Dr. Robert G. Sarrazin of Springfield issued a psychiatric report diagnosing Defendant with chronic paranoid schizophrenia for Axis I of the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision* ("DSM-IV TR"). (Exh. C at 8) This report conflicts with several prior Bureau of Prisons evaluations where Defendant had been diagnosed with a specific type of delusional disorder. In 2004, Defendant was diagnosed with methamphetamine induced psychotic disorder with delusions; in 2007, he was diagnosed with delusional disorder persecutory type; and most recently, in May of 2010, Defendant was again diagnosed with delusional disorder, persecutory type. (*Id.* at 2; Exh. E at 5)[1]

Dr. Sarrazin states that the diagnosis of chronic paranoid schizophrenia is based on Defendant having "a history of greater than six months of delusions, hallucinations, and disorganized speech." (Exh. C at 3-4) Dr. Sarrazin does not discuss at length the basis for changing Defendant's diagnosis, stating only, "Delusional disorder is a psychotic disorder like chronic paranoid schizophrenia. At this time, it appears that the diagnosis of paranoid schizophrenia better fits Mr. Barajas-Bandt's current presentation and past history." (Exh. C at 4) Dr. Sarrazin's report then provides a proposed treatment plan for Defendant's illness

---

[1] There are two other reports where Defendant is diagnosed with schizophrenia. First, Dr. Gariety's August 11, 2010 report diagnoses Defendant with schizophrenia. (Exh. A) As discussed above, the purpose of this report was to determine if involuntary medication was necessary due to dangerousness in the institutional setting. The report contains no discussion as to how the schizophrenia diagnosis was derived, although it does recount an interview where Defendant described "being a victim of government conspiracy, manipulation, and torture." (*Id.*) Second, Dr. Christina Pietz issued a September 1, 2010 Forensic Update that diagnosed Defendant with paranoid schizophrenia for Axis I of the DSM-IV. (Exh. D at 1) Like Dr. Gariety, Dr. Pietz does not discuss in detail the basis for her diagnosis, recounting only examples of Defendant's delusional beliefs and concluding, "Mr. Barajas-Bandt suffers from a delusional disorder and currently presents with significant psychotic symptoms (e.g., paranoia, delusional ideation) that are chronic and which have not remitted spontaneously or with non-medication interventions." (Exh. D at 2, 4) Dr. Pietz was the author of the May 2010 report that diagnosed Defendant with delusional disorder, persecutory type. (*See* Exh. E at 4) Dr. Pietz's forensic update does not address why this diagnosis changed, nor does it present any newly discovered facts that would support a change in diagnosis.

that consists primarily of second generation antipsychotic medicine, but also includes haloperidol ("Haldol"), a first generation antipsychotic. (*See id.* at 13-15; Exh. G at 1-2)

In a September 21, 2010 report, Defendant's expert, Dr. Mark A. Kalish, questioned Dr. Sarrazin's diagnosis of schizophrenia because there was no evidence that Defendant suffered from hallucinations or any other Criterion A symptom of schizophrenia other than delusions. (Exh. F at 3) Nevertheless, he opined that the proposed treatment plan "is reasonable, appropriate, and consistent with currently accepted practice guidelines." (*Id.* at 2) Dr. Kalish explained that although antipsychotic medications are less effective in treating a delusional disorder than they are in treating chronic schizophrenia, "[t]hat is not to say that they do not provide some benefit in reducing the intensity of the delusions or helping the individual disidentify from their delusional beliefs." (*Id.* at 3)

## II. DISCUSSION

"The government is allowed to medicate a defendant involuntarily for the purpose of rendering him competent to stand trial only in rare circumstances." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 687, 688 (9th Cir. 2010). Orders authorizing forcible medication for this purpose are disfavored. *Id.*

Under *Sell v. United States*, 539 U.S. 166, 180-81 (2003), the government may forcibly administer drugs to a mentally ill defendant in order to render him competent for trial only when the following factors are met:

1. "[A] court must find that important governmental interests are at stake."

2. "[T]he court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair."

3. "[T]he court must conclude that involuntary medication is necessary to further

|   |   |
|---|---|
|   | those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." |
| 4. | "[T]he court must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition." |

*Id.* (emphasis omitted). The government has the burden of establishing the facts necessary to allow it to prevail as to each of these factors by clear and convincing evidence. *Ruiz-Gaxiola*, 623 F.3d at 692.

The government does not assert any alternative justification for involuntary medication other than the restoration of competency. (Gov't Br. at 6) Defendant was found not to be a danger to himself or others in the institutional context pursuant to *Harper*. Further, as set forth below, there is no indication of a risk to Defendant's health if he fails to take medication. Thus, because safety and health concerns do not justify the involuntary administration of medication to defendant,[2] the Court proceeds to the *Sell* analysis.

## A. First *Sell* Factor

Under the first prong *Sell*, the government must establish "that important government interests are at stake." "The likely guideline range is the appropriate starting point in determining whether a defendant's crime is serious enough to satisfy the first prong of the *Sell* test." *Ruiz-Gaxiola*, 623 F.3d at 694 (internal quotation and citation omitted). The Court is then to consider whether the facts of the defendant's case present any "[s]pecial circumstances [that] may lessen the importance" of the government's interest in prosecution. *Sell*, 539 U.S. at 180. Such circumstances include the duration of current confinement, which would be credited towards any sentence ultimately imposed and the possibility that the defendant's refusal to take medication voluntarily could result in "lengthy confinement in an

---

[2] This is not to say that Defendant cannot be subject to civil commitment in the future. The *Harper* inquiry is limited to whether a defendant is dangerous while confined in an institution. Subsequent to a finding that a defendant cannot be forcibly medicated pursuant to *Sell*, the government may argue that civil commitment remains appropriate because the defendant poses a danger to the public if released from custody. *United States v. Godinez-Ortiz*, 563 F.3d 1022, 1030 (9th Cir. 2009).

institution for the mentally ill, which would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Ruiz-Gaxiola*, 623 F.3d at 694 (quoting and citing *Sell*, 539 U.S. at 180) (alterations omitted).

Defendant argues, and the government does not dispute, that Defendant's advisory guideline sentencing range is 70-87 months.[3] (Def. Br. at 5)  Defendant has presently been confined for approximately seventeen months. When the duration of his present confinement is deducted from the applicable guideline range, Defendant may be subject to an additional 53-70 months of imprisonment.  As illustrated by this sentencing range, the crime of threatening a federal judge in violation of 18 U.S.C. § 115(a)(1)(B) and 876(c) is sufficiently important to satisfy the first *Sell* factor.  *C.f. Ruiz-Gaxiola*, 623 F.3d at 695.

The possibility that Defendant could be subject to civil confinement in the future does not alter this conclusion.  Although hospitalization due to dangerousness to the public pursuant to 18 U.S.C. § 4246 may very well be appropriate given the nature of Defendant's threats, the Court has found no authority for the proposition that the possibility of future civil confinement, alone, prevents the government from satisfying the first prong of *Sell* when an individual is accused of threatening a federal judge.  Indeed, courts appear to uniformly find that the first *Sell* factor is met in such cases. *See United States v. Steward*, No. 06cr864, 2009 U.S. Dist. LEXIS 122829, at *12 (C.D. Cal. Dec. 10, 2009) ("Threatening judges is a serious crime under any reasonable standard. "); *United States v. Bush*, 585 F.3d 806, 815 (4th Cir. 2009); *United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005). Thus, although the Court has considered the potential for future civil commitment in its analysis, the Court concludes that the government has an important interest in bringing to trial an individual

//

---

[3] Defendant suggests that a downward adjustment and departure may be available for Defendant's mental illness and potential acceptance of responsibility, although these decreases are not included in his guidelines calculation. However, the Court notes that the adjustment and departure may not be applicable.  Defendant may not be entitled to a downward departure for his mental illness because his offence "involved . . . a serious threat of violence."  U.S.S.G. § 5K2.13. If acceptance of responsibility is deemed applicable, a two or three level decrease in the offense level for acceptance of responsibility does not alter the Court's conclusion that the government has an important interest in prosecution.

accused of threatening to kill a federal judge.

## B. Second, Third, And Fourth *Sell* Factors

However, the government has not met its burden of proving the remaining *Sell* factors. The government has not established that Defendant's diagnosis of chronic paranoid schizophrenia is proper. For this reason, it fails to prove by clear and convincing evidence that the "administration of the drugs is substantially likely to render the defendant competent to stand trial" or that the "administration of the drugs is medically appropriate" and thus, fails to satisfy the second and fourth *Sell* factors. "Because the government failed to prove the second Sell factor, it could not possibly have proved the third." *Ruiz-Gaxiola*, 623 F.3d at 703.

### 1. Propriety Of Schizophrenia Diagnosis

#### i. Diagnostic Criteria For Schizophrenia And Related Psychotic Disorders

According to the DSM-IV TR, to support a diagnosis of schizophrenia, two or more Criterion A symptoms (delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms, such as affective flattening, alogia, or avolition) must be present for a significant portion of time during a one month period. DSM-IV TR at 312. Next, five additional criteria – including a finding that schizoaffective disorder and mood disorder with psychotic features have been ruled out, that there have been continuous signs of the disturbance for at least six months, and that the disturbance is not due to the physiological effects of substance abuse – must be met. *Id.*

Delusional disorder, in turn, has diagnostic criteria that include nonbizarre delusions, and a finding that Criterion A for schizophrenia has never been met. *Id.* at 329. "The differential diagnosis between Schizophrenia and Delusional Disorder rests on the nature of the delusions (nonbizarre in Delusional Disorder) and the absence of other characteristics symptoms of Schizophrenia (e.g., hallucinations, disorganized speech or behavior, or prominent negative symptoms)." *Id.* at 310.

Finally, "a diagnosis of Psychotic Disorder Not Otherwise Specified may be made if insufficient information is available to choose between Schizophrenia and other Psychotic

Disorders." *Id.* at 311.

          ii. Basis For Government's Schizophrenia Diagnosis

The government's position that Defendant has schizophrenia may be questioned on several grounds. First, in three separate reports filed from 2004 to May of 2010, Defendant was diagnosed with a specific type of delusional disorder. Later government reports do not provide an adequate explanation for why this diagnosis changed, nor do they recount any events that took place in the interim that would subsequently support a diagnosis of schizophrenia.

Second, Dr. Sarrazin's assertion that Defendant has "a history of greater than six months of delusions, hallucinations, and disorganized speech" (Exh. C at 3-4) – the basis for his diagnosis of schizophrenia – does not appear to be supported by the record. Other reports describe Defendant speaking "clearly and articulately" without "any difficulty expressing himself." (Exh. E; *see also* Exh. A, Exh. D at 2 (describing speech as "articulate" and "normal in rate, rhythm and tone" and stating that "his thoughts were well organized"); Hearing Exh. 3 at 3 ("Speech was normal.")). Additionally, there is not sufficient evidence in the record that Defendant has suffered from hallucinations. (*C.f.* Exh. D at 2 ("Mr. Barajas-Bandt denied hallucinations and never appeared to attend to internal stimuli.")) Thus, contrary to the position asserted by Dr. Sarrazin, the Court finds only that Defendant suffers from delusions.

Presumably in light of these infirmities, at the *Sell* hearing, the government for the first time asserted that the schizophrenia diagnosis was appropriate based solely on Defendant's allegedly bizarre delusions. The government is correct that other symptoms, such as disorganized speech or hallucinations, need not be present to satisfy Criterion A of the DSM-IV diagnostic criteria for schizophrenia when delusions are bizarre. DSM-IV TR at 312. Although evidence as to whether Defendant had bizarre delusions is limited, Defendant's alleged belief that his kidney's were stolen would constitute a bizarre delusion as defined by

the DSM-IV.[4]

Nevertheless, the government's position that the record supports a diagnosis of schizophrenia based on Defendant's bizarre delusions is flawed. Although according to the DSM-IV TR, Criterion A may be satisfied by bizarre delusions alone, five additional criteria must be met before diagnosing an individual with schizophrenia. Here, no expert has opined that in addition to suffering from bizarre delusions, the remaining diagnostic criteria for schizophrenia have been fulfilled. Indeed, based on the record before the Court, it appears that Criterion C cannot be satisfied. Criterion C requires "[c]ontinuous signs of the disturbance persist for at least 6 months" that "must include at least 1 month of symptoms . . . that meet Criterion A." *Id.* Thus, when – as may be the case here – a patient suffers from bizarre and non-bizarre delusions and no symptom other than bizarre delusions is present to satisfy Criterion A, Criterion C requires evidence that the patient suffered from bizarre delusions for at least one month. Such evidence is not present in the instant case, as there is no information in the record to determine the duration of Defendant's alleged belief that his kidneys were stolen.

//

//

---

[4] The May 2010 Forensic Report states, "Over the last several years, Mr. Barajas has reported several different delusional beliefs that were persecutory in nature. At one time he claimed that his kidneys were stolen and that he was a victim of an organ black market." (Exh. E at 3) Such a belief would fall squarely within the DSM-IV TR's definition of "bizarreness." *See* DSM-IV TR at 324 ("Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences (e.g., an individual's belief that a stranger has removed his or her internal organs and replaced them with someone else's organs without leaving any wounds or scars).")

At the hearing, the government also pointed to Defendant's belief that he has kidney cancer as evidence of bizarre delusions. In one of Defendant's letters to Judge Houston, Defendant states that "I found out through esoteric means that I have cancer in my kidneys" and that "I did another . . . esoteric meditation exercise that brought me the information that I have kidney cancer." Tr. Exh. 5. The United States Marshals Service filed a report on Defendant approximately three months after this letter was sent that recounts Defendants' explanation for why he believes he has kidney cancer: "BARAJAS explained he has the ability to tap into his 'super consciousness'. He further stated he has trained himself to experience an altered state of awareness where he can communicate with different parts of his mind. During one of those 'journeys' his mind did a whole body diagnosis and informed him of the kidney cancer." Exh. B; *see also* Exh. C at 3. The Court is not satisfied that Defendant's cryptic statements about "esoteric meditation" and "super consciousness" render Defendant's delusions "bizarre" within the DSM-IV TR's definition.

Even if the government had put on evidence that these remaining criteria were satisfied, the Court still would question the propriety of a schizophrenia diagnosis based on bizarre delusions. There appears to be significant criticism of the use of bizarre delusions as a basis for satisfying Criterion A. *See, e.g.*, M. Cermolacce, L. Sass, and J. Parnas, *What is Bizarre in Bizarre Delusions? A Critical Review*, 36 OXFORD J. MED. SCHIZOPHRENIA BULL. 667, 676 (2010) ("Given the poor or middling reliability of the notion of BD [bizarre delusions] and the paucity of supportive empirical studies, many authors question the heavy diagnostic weighting or even the very relevance of BD."); *see also id.* ("[V]ery few individuals qualify for schizophrenia diagnosis purely by virtue of having BD."). Without testimony addressing these concerns, the Court does not find that Criterion A can be satisfied solely by bizarre delusions in this case.

2. Propriety of Treatment Plan

The Court cannot hold on the present record that the government has met its burden to establish that the administration of drugs is substantially likely to render the defendant competent to stand trial or is medically appropriate when the proposed treatment plan is premised on a possibly incorrect diagnosis.

This conclusion is bolstered by the Ninth Circuit's finding in *Ruiz-Gaxiola* that the government in that case failed to demonstrate that antipsychotic medication is the appropriate treatment for delusional disorder. *Ruiz-Gaxiola*, 623 F.3d at 697. It is unclear whether *Ruiz-Gaxiola* stands for the proposition that forcible medication is never appropriate when a defendant is diagnosed with a delusional disorder or whether this holding was limited to the record presented in that case. At a minimum, however, the Ninth Circuit strongly suggests that "Delusional Disorder and Schizophrenia are distinct disorders" and that by implication, a plan to treat the latter is not necessarily medically appropriate for the former. *Ruiz-Gaxiola*, 623 F.3d at 699; *see also United States v. White*, 620 F.3d 401, 420 (4th Cir. 2010) ("[T]he common wisdom in the psychiatric community is that delusional disorders

rarely respond to medication.") (internal quotation and citation omitted).[5]  Here, if Defendant was misdiagnosed with schizophrenia and his original diagnosis of delusional disorder was correct, then the Court cannot, consistent with *Ruiz-Gaxiola*, find that a plan designed to treat schizophrenia is medically appropriate or substantially likely to render Defendant competent to stand trial.

### III.  CONCLUSION

For these reasons, the government has failed to show by clear and convincing evidence that the implementation of its proposed treatment plan for schizophrenia is substantially likely to render Defendant competent to stand trial, is necessary to further important government interests, or is medically appropriate.  Accordingly, the government's request to forcibly medicate Defendant is **DENIED**.

The parties are to appear before the Court on March 29, 2011 at 2 p.m. for a status conference to set any further proceedings.

**IT IS SO ORDERED.**

DATED:  March 8, 2011

Honorable Barry Ted Moskowitz
United States District Judge

---

[5] The Ninth Circuit's position conflicts with Dr. Kalish's opinion that a treatment plan for schizophrenia is appropriate for an individual suffering from delusional disorder. (Exh. F at 2)  Dr. Kalish was not called as a witness at the *Sell* hearing.  Therefore, the Court cannot give sufficient weight to his report to constitute clear and convincing evidence.